JAMES J. MCMULLEN, JR. (SBN: 095853)
JMCMULLEN@GORDONREES.COM
STACEY M. COOPER (SBN: 226012)
SCOOPER@GORDONREES.COM
GORDON & REES LLP
101 West Broadway, Suite 2000
San Diego, CA 92101
Telephone: (619) 696-6700
Facsimile: (619) 696-7124

Attorneys for Defendants SSA MARINE, INC. AND SHIPPERS TRANSPORT EXPRESS, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GRAYLING TAYLOR, an individual, and BRUCE BROWN, an individual on behalf of himself and others similarly situated, | Case No.: 13-CV-02092-BRO(PLAx) |
| | *Honorable Beverly Reid O'Connell* |
| Plaintiffs, | Complaint filed:  January 31, 2012 |
| v. | Removed from: |
| SHIPPERS TRANSPORT EXPRESS, INC., a California corporation, SSA MARINE, a Washington corporation, and DOES 1 to 10 inclusive, | Superior Court of the State of California for the County of Los Angeles Case No.: BC477047 |
| Defendants. | **DECLARATION OF JAMES F. MAHONEY IN SUPPORT OF DEFENDANTS' OPPOSITION TO CLASS REPRESENTATIVE'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| | Hearing Date: July 21, 2014<br>Time: 1:30 PM |
| | Discovery Cutoff Date: 9/22/2014<br>Trial Date: 12/01/2014 |

I, James F. Mahoney, declare:

1. I have been retained as an expert witness by Defendant Shippers Transport Express ("STE") in the above-referenced matter.

**BACKGROUND**

2. I am familiar with the custom and practice in the trucking industry in general and the ocean container drayage industry, specifically. This is based on my

years of experience as a transactional and compliance attorney to the trucking industry, a trucking manager and executive, as well as a member and trainer for many trucking industry associations,

3. I have testified on two occasions, and I have attached hereto as Exhibit "1" a summary of my retentions, various testimony, and qualifications as an expert witness.

4. I have also attached hereto as Exhibit "2" a copy of my curriculum vitae.

5. I am licensed to practice law in Arizona, New Jersey, and New York. A significant portion of my practice involves consultations with transportation clients on state and federal issues and regulations common to the industry.

6. My practice and consulting business is focused on the trucking industry and various transportation clients. I have expertise in United States Department of Transportation ("DOT") compliance as well as Federal Motor Carrier Safety Administration ("FMCSA") regulatory compliance of motor carriers in interstate commerce. My clients include many of the largest trucking and transportation companies, as well as insurance carriers and insurance brokers engaged in transportation-related insurance business.

7. I was the Vice President and corporate counsel of Swift Transportation Co., Inc. ("Swift") from 2003 to 2009 and to this day continue in legal and consultative relationships with Swift. Swift is one of North America's largest transportation firms. It operates throughout the continental United States, Canada, and Mexico with approximately 18,000 power units, 60,000 cargo trailers and containers, 40 terminals, and 25,000 workers. Specifically, Swift has substantial operations at many ports in California and elsewhere. I have been involved with transportation issues for years and most of my professional career. As Vice President and corporate counsel of Swift, I became even more familiar with the

intricate operations and relationships in the trucking industry in general, including the unique operations in the Los Angeles/Long Beach Harbor area.

8. I submitted a declaration in opposition to Plaintiff's motion to certify a class of truck drivers seeking to be found to be employees. Since submitting that declaration, I have done additional research into the voluminous documents which have been exchanged in this litigation.

9. I have also conducted further research into the employment options available to drivers who possess a commercial driver's licenses and other endorsements and skill sets used in the container drayage business.

## A SUBHAULING METHOD OF OPERATION IS THE CUSTOM AND PRACTICE IN THE INDUSTRY

10. I know from my industry experience, including at Swift, and from the Kevin Baddeley depositions and declarations that STE operates an off-dock storage yard in Carson, California (as well as an off-dock storage yard in Oakland, California) and has used a contractor method of operation consistently since its incorporation in 1993. STE's facilities are used by many different companies in the transportation industry to enlarge the storage area where containers may be placed and staged for additional trucking transportation. Nevertheless, the availability of a truck dispatched from that location to or from other locations is also in demand.

11. I am aware that the California Air Resources Board ("CARB") and certain developments in the clean truck programs at the Ports of Long Beach and Los Angeles made older trucks (in fact all trucks which did not utilize an ecologically designed engine) obsolete or to some degree unusable in the state, and more particularly, banned in these harbor areas. This created significant truck shortages in the drayage community. Many drivers (owners, lessors, lessees, and employees) were quite upset that their equipment, which was bought, paid for or separately financed, and serving them well, was no longer usable or legal for operation in the

1  Long Beach / Los Angeles Harbor. This exacerbated the market conditions for
2  contractors to fill market needs.
3      12.    It was not surprising to me that after the recent enactment of revised
4  CARB Standards, STE decided it would rather lease than own trucks with company
5  (employee) drivers to move containers to its container storage yard. The demand for
6  trucking to and from its container storage yard creates a natural niche for a
7  dependable trucking businesses. However, owning and managing trucks and drivers
8  is a substantial undertaking.

### EMPLOYMENT DRIVER POSITIONS ARE AVAILABLE IN THE LA/LB HARBOR AREA BUT DRIVERS PREFER TO SUBHAUL.

11      13.    I have determined that in the Los Angeles/Long Beach ("LA/LB")
12  Harbor area, there is a high demand for truck drivers and an even higher demand for
13  eco-compliant trucks. There are several sources to obtain truck drivers, including
14  through agencies. A few of these include Trillium, One Source for Trucks, and Red
15  Dog. These companies, among many others, offer to employ drivers by the hour,
16  usually on relatively normal day shifts, for sums ranging from $14.50 to $16.50 per
17  hour. Indeed, I learned that Trillium and One Source actually employ drivers who
18  are dispatched by the STE. I know that drivers seeking a transportation contract and
19  a truck to lease are both aware of and advised that hourly employment is available
20  through other sources. In other words, virtually every independent contractor who
21  leases a truck through STE (or other motor carrier) is making a conscious decision to
22  be an independent contractor rather than an employee.
23      14.    There are several reasons drivers choose to be independent contractors.
24  For instance, I would expect that these drivers have other businesses, including
25  perhaps other transportation-related businesses that are conducted concurrently
26  when they provide drayage services to STE. This is borne out by the fact that
27  shipping manifest records and the driver file of Eduardo Avila that I reviewed, and
28  as maintained by STE, reflects contract settlements for less than full work weeks

with load history reflecting that (as required recordkeeping for the FMCSA and various taxing authorities). From my review of the evidence in this case, it appears that certain drivers work only one or two nights (or days) a week for STE. As stated above, I would opine that many individuals working fewer days than a full week are performing drayage services for STE to enhance other earnings, i.e., to garner the advantage of the fast revenue that can be generated in the harbor area when the marine terminals are very full and the need to move containers off their facilities rapidly is high. The pressure to move containers off ships and off terminals is extreme so that more ships can unload their cargo, reload and steam off. Motor carriers have surges; contractors know who to contract with at any given time.

  15. Once again, after review of the evidence in this case, it appears some of these drivers have unique needs or circumstances such as family obligations, childcare or unrelated businesses. The fulfillment of these unique needs is made possible by a flexible and short schedule of lucrative drayage work at the ports perhaps serially for several motor carriers.

## DRIVERS' PROFITS EXCEED THE WAGES THEY WOULD MAKE AS EMPLOYEE DRIVERS

  16. I have experience in and a working understanding the wages employee drivers make in ocean drayage deliveries compared to the compensation made by independent contractors. I also reviewed the check payment statements (trucker's settlements) which were produced in this action. My review of those records and prior experience suggests that on certain days and in certain circumstances, certain drivers may make slightly less than the employee drivers would on a per hour basis. However, I also know that certain drivers during certain periods of time, make several times the hourly rate paid by "employers." The amount of net profit when computed on an hourly basis can be in excess of $40 per hour. Obviously, the incentive to generate profit at that rate is sufficient to motivate entrepreneurial

contractor drivers. However, as I have set forth earlier, the ability to control work periods, breaks, length of work, manner of work, ability to select particular loads, and reject other loads when they do not appear to fit with the business plan designed to create the greatest profit, are also powerful incentives to contractors. Virtually all or most dray drivers know this opportunity exists for them.

17. In my opinion, each Plaintiff in this case has had experience as both contractor and employee driver. Each Plaintiff will understand the difference and each has made a conscious choice one way or the other.

## DRIVERS ARE IN CONTROL OF THEIR BUSINESSES.

18. As stated, I have reviewed deposition testimony in this case and recognize that STE offered one day leases to drivers in Southern California. Competing motor carriers at the ports often solicit one another as to whether they know of any contractors needing assignments. Motor carriers frequently direct idle owner operators to their port competitors so that the motor carrier requesting can fulfill its customer obligations. "Market" forces, in their most elemental form, are in play at the ports. That is, there is a constant ebb and flow for needed capacity depending on what ship comes in when and which carrier provides customer services. This competition creates a market for contractor pricing and services.

19. One-day leases are an efficient solution peculiar to market conditions relative to port operations and drayage movements. It allows the independent drivers to exercise optimum control in planning. It enhances their entrepreneurial chance at profits. Day leases allow dray drivers to work when and for how long they deem best (Notice of Lodging, Exhibit 21, Deposition of Luis Alvarez taken on March 20, 2013, p. 66). They need not work long hours six or seven days a week just to afford the very expensive trucks required by the Ports and CARB. The newly legal power units (tractors) are an exceptionally expensive piece of financed equipment, which would result in dray providers incurring extensive and costly financing; it would result in limiting the individual driver's chance at a profitable

business model. Additionally, independent dray drivers are not saddled with an employer's driving schedule forced upon them and /or burdens of ownership such as truck garaging and safety upkeep expense that they do not want or cannot afford if the truck is idle. The day lease model provides efficiencies so that the truck can be kept in good and safe condition; fuel, insurance or damage expenses are apportioned to the several dray drivers and can be spread over time; and the truck can be cost-effective to STE because the unit can be leased to more than one driver, with STE bearing the cost of maintenance, garaging, safety lanes and cleanliness.

20. Additionally, as independent contractors, drivers have the ability to have their own motor carrier customers in addition to hauling loads dispatched by STE. Depending on the economic circumstances at the time, a driver may decide to haul exclusively for STE for a week or month or more; however, should there be a shift in available loads and fewer available for hauling at STE and an increase in available loads somewhere else, drivers then optimize their profits by hauling for the other company. This is a practice prevalent throughout the industry. Along this same line, drivers may shop or solicit work from STE on a sporadic basis as their particular plan dictates. Each assignment is brief and finite and in no way characteristic of a employment relationship.

21. The economic and operational factors affecting drayage drivers are unique. Marine terminal drivers service a unique market – motor carriers. Nights are extremely busy if ships are in the port. Ships must turn quickly to see profits. Then there are times of minimal activity (Notice of Lodging, Exhibit 21, Deposition of Luis Alvarez, p. 70). Port drayage drivers often have day employment or private businesses. Many port drivers often drive only in the evenings when the ports are exceptionally busy and these contractors <u>want</u> frequent drayage from the terminals to complete multiple turns, which, of course, generates greater revenue because of their efforts: high volume business over a short period of time equals more revenue, the entrepreneurial aspect of their business.

22. As with any business, some drivers are quite savvy as to revenue and profits. They know when to drive and which loads are quick and profitable. They have a network of clients and their own independent drivers, all of which creates a network of further "trip leasing," revenue sharing, and, various responsibilities and overhead among their network. For example, Luis Alvarez previously worked for a small business that had a fleet of six or seven power units servicing STE and was paid a percentage of the load (Notice of Lodging, Exhibit 21, Deposition of Luis Alvarez, pp. 16 and 20).

23. As touched on above, the model of an independent driver utilizing a day or week lease is just one form of service provided to motor carriers. For a variety of reasons, e.g., part-time work, unavailability because of commitment to other fulltime jobs, lack of capital for truck investment, or just to increase leisure time, drivers switch to short-term leasing to earn income or to supplement their financial needs (Notice of Lodging, Exhibit 21, Deposition of Luis Alvarez, p. 69).

24. It is complained that owner-operators must communicate with the motor carrier on a daily basis or at the time of reaching certain goals in their work. It is argued this is evidence of control. But, the purpose of communications is to synchronize the motor carrier business with the driver business as the parties have contracted. Coordination of when the driver makes a delivery and whether the driver would be able to haul another load in compliance with the hours of service regulations are necessary; plus assuring dispatch that the operator did not suffer hijacking, injury, illness, and to effect the efficient passing on of any emergency information; or, advising the operator of any deviation of freight to an alternate delivery point; or of severe weather and road closings; or monitoring the progress and location of the shipment as the motor carrier had agreed with the cargo owner.

25. I was provided with the transcript of an EDD hearing in which drivers testified and explained their methods of operation. It is notable that Claimant in that case specifically and routinely referred to his operation as an independent trucking

Gordon & Rees LLP
101 West Broadway, Suite 2000

business and complained of the interference by safety triggers with his business. This same driver apparently also provided interviews in which he extols the virtues of being an independent owner operator and independent business owner.

26. Nevertheless, he and some of the witnesses contend that it is difficult to operate their driving business, including the securing of regulatory insurance. In this regard, I learned that when these drivers ask about using the truck elsewhere, STE explains how to do that. This is not uncommon. Motor carriers such as JMKC Express, Tradelink Transportation, Inc., Pac Anchor Transportation, Progressive Transportation, Del Well, Total Transportation Services, Inc. will dispatch contractors as long as the FMCSA safety regulations are met. The motor carriers using independent contractors have the resources to supply insurance, which cannot easily economically be purchased short term. These companies also have magnetic and/or adhesive placards. The entire process of qualifying drivers under DOT standards requires only one to two hours and if a driver has qualified once and the truck is safe, the process is a one-time event. Swift Transportation, my former employer, is among the many hundreds of trucking companies that can accommodate contractors who lack insurance or individual motor carrier authority. Swift provides insurance and placards to drive under Swift's authority.

**THE MOTOR TRANSPORT INDUSTRY IS A HIGHLY REGULATED INDUSTRY.**

27. The natural tendency of people is to presume that an individual performing work for a business is an employee of that business. This is especially so when the terms of that individual's work are closely regulated, as in trucking. In fact, because the motor transport industry is a "highly regulated business," the U.S. Supreme Court exempts law enforcement officers from the search warrant requirement under the Fourth Amendment. A warrantless stop and search is Constitutional.

28. Utilizing the leasing requirements set forth in the federal regulations to support a claim of employment is an inaccurate assumption, especially in light of the clear language in the regulations cautioning against it:

> *"Nothing in the provisions required by paragraph (c)(1) [pertaining to lease and exclusive possession, control and use by the motor carrier] is intended to affect whether the lessor [contractor] or driver is an independent contractor or an employee of the authorized carrier lessee [motor carrier].* 49 C.F.R. § 376.12(c)(4).

29. Along these same lines, recently, the Idaho Supreme Court looked at the issue of whether an owner/operator must have his/her own DOT number and operating authority to be considered a separate business entity from the motor carrier for which it hauls freight. The Court found the arguments flawed that a contractor must have his own authority because it failed to consider the nature of the owner/operator's business, which serves a distinct market in the interstate trucking industry. The business or service provided by an owner/operator is the transportation of goods for motor carriers. Owner/operators are dependent on the motor carrier's DOT authority and cargo contracts. This dependence is an intentional and fundamental part of the motor carrier-owner/operator relationship under the FMCSRs. The fact that an owner/operator may or may not have his own DOT authority is completely inconsequential and irrelevant for him to provide his services to a motor carrier, whereas it would be essential in hauling for a manufacturer or shipper. Federal law and regulations <u>require</u> that an owner/operator operate under the motor carrier's DOT authority, even if the owner/operator has his own DOT authority. 49 U.S.C. § 14102; 49 C.F.R. §§ 376.1-376.2, 376.11-376.12, 390.11. In determining whether an owner/operator is engaged in an independently established trade, occupation, profession, or business, the focus has to be on the market served by the owner/operator. If the business served by the owner/operator is a manufacturer or shipper of goods, then the owner/operator must have his own

DOT authority. In serving the motor carrier market as a trucker, the owner/operator <u>must</u> use the motor carrier's DOT authority. That federal requirement is no more an indication of control or lack of independence than other types of federal regulations. See, *Western Home Transport, Inc. v. Idaho Department of Labor*, #40462 (Id. S.Ct., Feb. 11, 2014).

30.  In 1978, the Surface Transportation Board ("STB") established four main objectives to uniformly apply to truck leases (not financial leasing, but rather, equipment leasing). The four objectives are: (1) simply existing and new leasing regulations and to write them in more understandable language; (2) promote truth-in-leasing; (3) eliminate or reduce opportunities for skimming and other illegal or inequitable practices; and (4) promote the stability and economic welfare of the independent contractor segment of the motor carrier industry. *Leasing and Interchange of Vehicles*, 129 M.C.C. 700 (1978) citing *American Trucking Association v. United States*, 344 U.S. 298 (1953).

### STE IS REQUIRED TO COMPLY WITH THE FMCSRS FOR ALL SUBHAULERS.

31.  Although not specifically stated in my earlier declaration, I have knowledge of the legislative history of the federal motor carrier laws mandating safety management systems. The DOT has a Congressional mandate to reduce crashes. These safety management systems are mandated for all drivers, including independent contractor drivers and for motor carriers. The regulations and legislative history establish that the safety management system were specifically intended – and currently still state – that the regulations are not to impact the question or employee / employer versus independent contractor status. The reasons include enforcing safety but with the institutional knowledge that contractors have long been part of the operation. Specifically, the regulations place the burden of safety on each participant in the system – driver, motor carrier, broker and soon

1  shipper – regardless of driver status and without regard to common law details of
2  control.
3       32.    The Federal Motor Carrier Safety Regulations ("FMCSRs") are a
4  comprehensive set of federal regulations, strictly enforced by the FMCSA, which
5  are meant to establish and standardize certain safety issues for, among others, motor
6  carriers and their drivers who operate commercial vehicles on public highways in
7  interstate commerce.  The FMCSRs are contained in Subchapter B, Chapter III,
8  Subtitle B of the Code of Federal Regulations Title 49 – Transportation; Parts 303
9  and 325 are contained in Subchapter A of Chapter III; Part 40 is contained in Subtitle
10 A of Title 49; Appendices A through G are contained in Subchapter B of Chapter III.
11       33.    The FMCSRs are administered by the FMCSA for the stated purposes
12 of reducing commercial vehicle accidents; decreasing fatalities, injuries and
13 property loss involving commercial motor vehicles through the application of
14 <u>minimum</u> safety standards in fleet operations, driver management and overall safety
15 management plans of operation by DOT-authorized motor carriers. With very
16 limited exception, all private and for-hire motor carriers that operate in interstate
17 commerce must strictly comply with the FMCSRs or be subjected to revocation of
18 operating authority by the FMCSA, or incur fines or criminal penalties, all of which
19 effectively may end motor carrier operations or, at the least, may detrimentally
20 affect relationships with shipping customers and insurers.
21       34.    The U.S. DOT / FMCSA maintains a Safety Measurement System on
22 every motor carrier's on-road performance, including driver performance.  The
23 system is used by the public, by customers, and by insurers to assess the motor
24 carrier safety history, reliability and insurability.  No state entity has authority to
25 revoke a motor carriers' ability to engage in interstate commerce.  If interstate motor
26 carriers violate the safety laws of the State, it is up to the federal government to
27 protect the state's interest through federal enforcement proceedings, while the state
28 can administer traffic and criminal violations on its highways.

35. STE is a for-hire motor carrier of property operating in interstate commerce, and both STE and its drivers are subject to the requirements of the FMCSRs.[1] As of November 4, 2013, STE has a "satisfactory" safety rating from the FMCSA – the highest rating – and last had a safety review by the Agency on January 23, 2013.

36. The FMCSA requirements as evidenced in the STE DQ file do not exhibit or demonstrate any variant of driver control in excess of that which is necessary for STE to comply with the federal safety regulations contained in the FMCSRs. Those FMCSRs are mandated by the DOT so that STE can maintain its motor carrier authority to operate.

## MARINE TERMINALS ENFORCE THEIR OWN SAFETY RULES.

37. I have reviewed some testimony which suggests that truckers believe they are being controlled by STE even while they are on a marine or inland terminal of other companies. Marine and inland terminals alike will disqualify or exclude drivers who violate their particular safety and operational rules. If a driver commits a safety offense and leaves the terminal, it is not unusual for terminal security to contact the carrier dispatch with a warning or suspension. Some drivers believe this is discipline coming from STE when, in fact, it is a terminal operator enforcing its own safety rules.

I know each of the above matters based upon my own personal knowledge or I have opined based upon information and belief that I have set forth.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

Executed this _____ day of June 2014, at Phoenix, Arizona.

---

[1]. STE is a registered motor carrier with DOT census number 550967 and motor carrier number MC-272117. This motor carrier number is evidence that STE has FMCSA authority to operate in interstate commerce.

James F. Mahoney